UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JACKIE W. NASH )
 )
V. ) NO. 2:10-CV-270
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is a judicial appeal of the administrative denial of the plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security following an administrative hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10 and 12].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 45 years of age, or a "younger" individual at the time of his disability onset date. He has a high school education. He cannot return to his past relevant work. He alleges disability due to various physical impairments and depression. Earlier applications dated December 27, 2005 were denied by the Commissioner, and that finding was upheld by this Court in Case 2:08-CV-185, on July 14, 2009. The present case is different because in addition to the physical impairments alleged in his prior applications, the plaintiff asserts disability due a mental impairment. In fact, it is the determinations of the ALJ regarding this mental impairment which is the sole issue raised in the plaintiff's Motion.

The plaintiff raises no issue regarding the ALJ's findings regarding the severity of his physical impairments. Nevertheless, since the plaintiff's physical medical problems are referenced in the medical assessment of his treating psychologist, his physical medical history is germane to this case. His medical history is summarized in the plaintiff's brief as follows:

> Plaintiff has received treatment at Bristol Regional Medical Center. Admission was required from September 9, 2005 through September 12, 2005, after Plaintiff presented with left anterior pressure type chest pain with radiation into his back, as well as intermittent left arm pain. Plaintiff was found to be suffering from an acute inferior wall myocardial infarction, for which he underwent left heart catheterization with left ventriculogram, as well as placement of a temporary pacemaker, with subsequent percutaneous coronary intervention with implantation of a drug-eluting stent to the right coronary artery. The final diagnoses were inferior wall myocardial infarction, bradycardia, cardiogenic shock, hypokalemia, hypertriglyceridemia, and diabetes mellitus (Tr. 213-249). Plaintiff received Emergency Room treatment on September 14, 2005 and December

8, 2005, due to complaints of flank pain, cold symptoms, body aches, and fatigue. The diagnoses were pneumonia, viral syndrome, mild bronchitis, and otitis media (Tr. 194-212).

Admission was again required from December 24, 2005 through December 28, 2005, after Plaintiff developed an onset of substernal chest discomfort. EKG in the Emergency Room was consistent with an acute inferior wall myocardial infarction. In the cardiac catheterization lab, Plaintiff was found to have a totally occluded right coronary artery which was opened successfully. After the catheterization, Plaintiff began having diplopia, slurred speech, and right-sided weakness, thus neurology consultation was obtained. Dr. Wilson's impression was left hemisphere cerebral infarction, cannot rule out a brainstem event; diplopia; question medication effect; heart disease with previous myocardial infarction, stent and revision earlier today; elevated cholesterol; and diabetes. Subsequent head CT yielded the impression of multiple areas of vascular atresia including the left A1 segment, the distal left basilar supplying the left posterior cerebral, and the entire right vertebral artery. Consultation by Dr. Amin was also obtained, due to uncontrolled diabetes. Review of systems was positive for shortness of breath with exertion, chronic left shoulder pain, and depression. Dr. Amin's impression was diabetes mellitus, type II, uncontrolled secondary to noncompliance with diet and medications due to inability to purchase medication; acute MI secondary to thrombosed arterial stent; left CVA; hyperlipidemia; and tobacco abuse. The final diagnoses upon discharge were acute inferior wall myocardial infarction, left hemisphere cerebral infarction, hypercholesterolemia, and diabetes (Tr. 137-193).

Plaintiff was again hospitalized from May 27, 2006 through May 29, 2006, after he presented with anterior chest pain described as an aching or pressure sensation. EKG was felt to be consistent with an acute inferior wall myocardial infarction, manifested by increased ST segment elevation in the inferior leads and reciprocal changes in I and AVL. Previous EKGs were noted to have shown slight ST elevation with Q-waves inferiorly. Left heart catheterization was performed emergently with a c/5 x 20 mm TAXUS stent inserted into the right coronary artery and proximal mid portion with good results. The discharge diagnoses were acute inferior wall myocardial infarction, reocclusion of the right coronary artery; status post PCI to the right coronary artery in September of 2005 and December of 2005; previous evidence of cerebellar pontine cerebrovascular accident; diabetes mellitus; hyperlipidemia; and tobacco abuse (Tr. 279-313).

Plaintiff underwent lower extremity arterial study on June 9, 2006, due to right leg pain with walking. The impression noted severe hypotensive response to exercise on the right lower extremity; no evidence of left lower extremity rest or exercise hypoperfusion; likely high-grade stenosis or total occlusion of the fight iliac artery or right common femoral artery (Tr. 273-278).

On June 27, 2006, CTA of the abdominal aorta and lower extremities yielded the impression of a severe elongate stenosis of the right common iliac artery beginning just below its origin extending to the level of the internal iliac artery origin; a small anterior lumen remains, which would facilitate percutaneous transluminal recanalization; mild focal stenosis in the mid left common iliac on the left; and good infrainguinal runoff bilaterally (Tr. 268-270).

Dr. Benjamin S. Scharfstein treated Plaintiff from June 19, 2006 through October 1, 2007, due to peripheral vascular disease, severe right hip and thigh claudication, and

3

right groin pain (Tr. 271, 329-348). On July 10, 2006, Dr. Scharfstein performed abdominal aortogram with limited right lower extremity arteriogram and percutaneous balloon expandable stent deployment, right common iliac artery. The final impressions were conformation of a severe, irregular, elongate stenosis of the entire right common iliac artery with associated flow disturbance into the internal iliac and external iliac systems with correction of the stenosis using a balloon expandable stent (Tr. 259-267).

Plaintiff received Emergency Room treatment on three occasions from June 17, 2007 through April 25, 2008, due to persistent left hip, left leg pain, and left rib contusion (Tr. 314-328, 349-362).

Dr. Christopher J. Kennedy treated Plaintiff from July 11, 2006 through May 28, 2008, for follow-up status post myocardial infarction times two with history of cerebrovascular accident. Additional problems noted include hyperlipidemia, diabetes mellitus, right lower extremity pain secondary to right sided aorta iliac disease, depression, and hip pain (Tr. 363-367).

Plaintiff received treatment at Appalachian Orthopaedic Associates from August 14, 2008 through September 4, 2008, due to bilateral hip pain secondary to bilateral greater trochanteric bursitis. Exams were remarkable for maximal tenderness over the bursal region just posterior to the greater trochanter bilaterally. Therapy did little to help Plaintiff's pain, thus he was given an injection of the right greater trochanteric bursa (Tr. 368-371A).

On September 29, 2008, a reviewing state agency physician opined Plaintiff can lift/carry a maximum of 50 pounds occasionally, 25 pounds frequently; can stand/walk for a total of about six hours in an eight-hour workday; can sit for a total of about six hours in an eight-hour workday; and can frequently climb, balance, stoop, kneel, crouch, and crawl (Tr. 372-377). On October 8, 2008, a reviewing state agency psychologist opined Plaintiff does not have a medically determinable mental impairment(s) (Tr. 378-391).

Plaintiff received treatment at Mountain Empire Neurological Associates from January 29, 2007 through October 21, 2008, for follow-up status post stroke. Problems noted during treatment include restless feeling in the right arm, decreased memory, sleep disturbance, diabetes mellitus with neuropathy, decreased vision, coronary artery disease, hypertension, disorders of lipoid metabolism, bilateral hip and knee pain, right groin pain, restlessness, lightheadedness, balance problems/unsteady gait, mood problems, fatigue, left eye twitching, stress, depression, chest pain, joint pain and stiffness, muscle aches, and weakness in the hips and legs (Tr. 392-405).

Plaintiff received treatment at Twin City Medical Center, by Dr. Roy R. Andrews and Psychologist Bill McFeature, from June 12, 2006 through December 9, 2008. Conditions and complaints addressed include diabetes mellitus, coronary artery disease, hyperlipidemia, restless movement of the arms, right hip avascular necrosis, fatigue, lack of energy, shortness of breath, hypertension, history of heart attacks and stroke, post-stroke neuropathy of the right arm, osteoarthritis, bilateral hip and knee pain, left knee swelling, depression, adjustment disorder with mixed emotional features, exhaustion, anxiety, heartburn, chest pressure, feeling worthless, left lower back tenderness, and partner relational problems (Tr. 406-459).

On February 2, 2009, a reviewing state agency psychologist opined Plaintiff's mental impairment(s) are not severe (Tr. 460-473). On February 10, 2009, a reviewing state agency physician opined Plaintiff can lift/carry a maximum of 20 pounds

4

occasionally, ten pounds frequently; can stand/walk for a total of about six hours in an eight-hour workday; can sit for a total of about six hours in an eight-hour workday; can never climb ladders, ropes, or scaffolds; can frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl; should avoid all exposure to hazards (machinery, heights, etc.); and should avoid concentrated exposure to extreme cold and extreme heat (Tr. 474-482).

[Doc. 11, Pgs. 2-6].

Following the State Agency review in February 2009, plaintiff submitted additional evidence regarding his treatment at Twin City Medical Center by Dr. Andrews and Dr. McFeature, the plaintiff's treating psychologist. That treatment is recounted in the plaintiff's brief as follows:

> Plaintiff continued treatment at Twin City Medical Center, by Dr. Andrews and Dr. McFeature, from January 28, 2009 through November 2, 2009. Problems addressed during this time include depression, excessive worry, coronary artery disease, hypertension, uncontrolled diabetes mellitus with neurological manifestations, hyperlipidemia, gastroesophageal reflux disease, chronic fatigue, shortness of breath with exertion, right hip avascular necrosis, bilateral lower extremity pain, swelling of the hands, positional dizziness, stress, bereavement, grief reaction, and skin disorder (Tr. 487-515).
> On December 15, 2009, Dr. McFeature opined Plaintiff has no useful ability (poor/none) to deal with work stresses; understand, remember, and carry out detailed job instructions; or demonstrate reliablity. Plaintiff's ability to function was noted to be seriously limited, but not precluded (fair) in the areas of dealing with the public; maintaining attention and concentration; and understanding, remembering and carrying out complex job instructions. To support his assessment, Dr. McFeature noted Plaintiff's depressive disorder secondary to (his) medical condition.

[Doc. 11, Pgs. 6 and 7].

At the administrative hearing, the ALJ asked Cathy Sanders, a Vocational Expert ["VE"] to consider the physical limitations set forth in "Exhibit B13F."[1] To these he added,

---

[1] That is the medical assessment of State Agency reviewing physician Dr. Christopher W. Fletcher (Tr. 474-82). Dr. Fletcher opined that the plaintiff could frequently lift 10 pounds, occasionally lift 20 pounds, stand and/or walk for at least 6 hours in an 8-hour work day, sit for at least 6 hours in an 8-hour work day, and push or pull those weights. He opined the plaintiff should never climb ladders, ropes or scaffolds. He stated the plaintiff should avoid concentrated exposure to extreme heat and cold, and all exposure to hazards such as operating machinery and heights.

5

no driving on the job, rotating shift work, and working alone. He further added a limitation to "Simple, routine, repetitive work with no public contact." When asked if there would be jobs, Ms. Sanders identified 3,800 in the region and 3.2 million in the nation such as cleaners, dishwashers, food preparers, laundry attendants, hand packagers and working in "smaller shops such as mail shops." (Tr. 565).

In his hearing decision, the ALJ found that the plaintiff had severe impairments of coronary artery disease; peripheral artery disease; status/post cerebrovascular accident; and a depressive disorder. (Tr. 20).

In evaluating plaintiff's mental impairment, the ALJ found that the plaintiff had a mild restriction in activities of daily living, noting that "while his impairment may interfere with complex activities, his performance of a simple routine is appropriate, effective and sustainable." The ALJ found moderate difficulties in social functioning and concentration persistence and pace, and no episodes of decompensation. He found that the plaintiff had the residual functional capacity set forth in the question to the VE described above. (Tr. 21).

With respect to the mental impairment, the ALJ discussed Dr. McFeature's treatment notes and opinions at great length. He noted that those notes showed the plaintiff "exhibited only mild depressive symptoms..." He stated that "on December 19, 2008, Dr. McFeature informed the claimant that he had no primary psychological disorder that was considered disabling." He then noted the December 19, 2009 mental assessment provided by Dr. McFeature. He stated that Dr. McFeature's findings were "essentially consistent with the residual functional capacity as set forth above." Particularly, the ALJ pointed out that he had

6

"made provisions wherein the claimant is limited to the performance of simple, routine and repetitive tasks" which was consistent with Dr. McFeature's findings regarding "a poor ability to perform detailed, not complex, job instructions." (Tr. 23). He found the plaintiff to be not entirely credible based largely upon his stated activities and the treatment notes of his physicians, along with the absence of "specific restrictions recommended by any treating physician, despite the claimant's assertions that he is totally disabled." (Tr. 23-24).

Regarding opinion evidence, he found Dr. McFeature's opinion from December 9, 2008 that the plaintiff had no disabling psychological condition was entitled to, and given, "significant weight." As for the December 15, 2009 assessment of Dr. McFeature, the ALJ basically agreed with him except for the findings of a poor ability to deal with work stresses or to demonstrate reliability, noting that both were "based on the claimant's cardiovascular status." He stated that these were rejected because Dr. McFeature was a mental health practitioner and thus, "the assumptions he has made are outside his area of expertise." He gave "significant weight to the opinions of the State Agency medical consultants in limiting the claimant to light work with additional limitations." (Tr. 24).

Based upon the testimony of Ms. Sanders, he found that there was a significant number of jobs the plaintiff could perform. Accordingly, he found plaintiff was not disabled. (Tr. 25-26).

Plaintiff asserts that the ALJ's decision was not founded upon substantial evidence because the ALJ erred in not accepting and giving controlling weight to all areas of Dr. McFeature's December 15, 2009 mental assessment. He states that as a treating source, and as the only examining source, Dr. McFeature's opinion is subject to "complete deference" in

7

the absence of a contrary medical report. He argues that the State Agency psychologist's assessment is entitled to weight only as it is supported by evidence in the record, including evidence received after the assessment, such as the December 15, 2009 assessment of Dr. McFeature, relying upon the language of *SSR 96-6p*. He asserts that once Dr. McFeature's assessment was submitted, the ALJ should have sent the plaintiff for a consultative mental exam, but instead rendered "his own opinion."

In fact, there was a contrary opinion from a treating source, Dr. McFeature himself. As the ALJ pointed out, in a December 9, 2008 treatment note Dr. McFeature stated "patient has applied for disability but (Dr. McFeature) informed patient he has no primary psychological disorder that is considered disabling, does report feeling physically fine at this time,..." (Tr. 407). This diagnosis and opinion came not at the outset of the treatment relationship. Instead, it came after visits on May, 19, 2008, June 9, 2008, July 7, 2008, July 28, 2008, August 19, 2008, September 23, 2008, and November 18, 2008. The following February, with Dr. McFeature's records up to that point before him, State Agency psychologist Dr. Fawz E. Schoup, Ph.D. opined that the plaintiff's "allegations are non-severe, singly or combined." (Tr. 472).

Accordingly, there were not none, and not one, but two medical opinions that the plaintiff had no disabling mental impairment. The issue is, did anything change between the dates of Dr. McFeature's December, 2008, opinion; Dr. Schoup's February, 2009, opinion, and the date of Dr. McFeature's December, 2009 mental assessment?

The plaintiff's history with Dr. McFeature during this time period is fairly set forth in the Commissioner's brief as follows:

8

> On January 28, 2009, Dr. McFeature saw Mr. Nash, noted a diagnosis of depressive disorder (NOS - not otherwise specified) and reported that he had reviewed Mr. Nash's symptoms which reflected increased worry associated with child support enforcement issues (Tr. 510). Dr. McFeature commented that this seemed to be a theme with Mr. Nash (Tr. 510). Dr. McFeature also noted Mr. Nash's cardiovascular problems, but reported that Mr. Nash had stated that he was feeling fine and stable with this issue (Tr. 510).
>
> On March 4, 2009, Mr. Nash told Dr. McFeature that his heart was doing fine, although he had decreased energy (Tr. 507). Mr. Nash rated his emotional status as "fair" (Tr. 507).
>
> On April 9, 2009, Dr. McFeature stated that Mr. Nash reported doing "fair" emotionally though not clinically depressed at this time (Tr. 506). He was, however, distressed with life (Tr. 506). He was continuing to apply for disability for medical reasons (Tr. 506).
>
> On June 3, 2009, Mr. Nash stated that his cardio management was going well (Tr. 500). Dr. McFeature commented, "patient appears to be doing fine and reports the same" (Tr. 500).
>
> On July 1, 2009, Dr. McFeature identified Mr. Nash's primary diagnosis as bereavement and stated that Mr. Nash had reported grieving over the loss of his girlfriend after five years (Tr. 495). Mr. Nash said he was assisting in the care of the girlfriend's two children (Tr. 495). On July 16, 2009, Dr. McFeature and Mr. Nash processed grief issues (Tr. 494). Mr. Nash reported no cardio problems, and Dr. McFeature opined that Mr. Nash was coping "fair" with his loss (Tr. 494).
>
> On August 18, 2009, Dr. McFeature identified a diagnosis of depressive disorder NOS and stated that Mr. Nash's symptomology reflected an elevated mood, good energy and sleep, and no pain (Tr. 491).
>
> On September 23, 2009, Dr. McFeature informed Mr. Nash that there was no need for him to be seen at this time (Tr. 488). Mr. Nash reported doing well both physically and emotionally (Tr. 488). Dr. McFeature stated that he planned to see Mr. Nash again in three months (Tr. 488).

[Doc. 13, Pgs. 4 and 5].

Also occurring during this time frame are visits by the plaintiff with Dr. McFeature's associate, Dr. Roy Andrews, DO. He was apparently seen by Dr. Andrews to monitor his physical signs and any overt signs of mental problems between visits to Dr. McFeature. On February 2, 2009, Dr. Andrews noted that the plaintiff "appears to be in no acute distress and is awake, alert and oriented to person, time and place..." In that same treatment note, Dr.

Andrews opined that plaintiff "does not appear to be depressed, anxious or stressed." (Tr. 508-09). On June 2, 2009, Dr. Andrews again stated plaintiff "does not appear to be depressed, anxious, or stressed." (Tr. 502). Likewise, July 29, 2009, Dr. Andrews *again* stated that the plaintiff "does not appear to be depressed, anxious, or stressed." (Tr. 492).

It is true that in his December 15, 2009, mental assessment, Dr. McFeature opined that the plaintiff had no useful ability to deal with work stresses. However, he bases this on "cardio," and advises to "see medical condition (cardiovascular)." He also says, regarding the depressive disorder itself, "Primary to Depressive Disorder, Mild." (Tr. 523). This later statement seems to indicate that the depressive disorder itself, apart from the reported cardiovascular problem, would produce only *mild* limitations, which is entirely consistent with the December, 2008 treatment note. With regard to the nonexistent ability regarding complex job instructions and to demonstrate reliability, Dr. McFeature again attributes this to the cardiovascular condition.

There is absolutely nothing in the record to indicate that the plaintiff's cardiovascular situation would cause any problems beyond the limitations set forth by the ALJ in his finding of residual functional capacity. In fact, those limitations on the physical side did not come from any treating cardiologist or other treating doctor but from the State Agency physician.

In the opinion of this Court, it was appropriate for the ALJ to give little weight to the opinions in the December, 2009 assessment which were attributable to the cardiovascular problems apparently reported to Dr. McFeature by plaintiff. This would be true both because the severity of the cardiovascular complaints were outside of Dr. McFeature's expertise, *and* because nothing but benign findings were set forth by either Dr. McFeature or his associate,

10

Dr. Andrews since the clear statement by Dr. McFeature in December, 2008, that the plaintiff was not disabled by any mental impairment. In fact, plaintiff was doing so well that Dr. McFeature told him in September, 2003 that there was "no need to be seen at this time..." and that "stability" was noted, and a "validated coping style." (Tr. 488). Neither the ALJ nor this Court are "playing doctor" in this regard. That earlier opinion, the subsequent treatment notes, and the opinion of the State Agency doctor all provide substantial evidence to support the level of severity found by the ALJ and set out in his RFC finding.

The ALJ had substantial evidence to support his findings and properly and painstakingly considered the evidence. It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 10] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be GRANTED.[2]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

11